# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **DEBRA A. SCHULTZ**, by and through her conservator, STEVE B. MORRIS, | Case No. 3:11-cv-1467-SI |
| Plaintiff, | |
| v. | **OPINION AND ORDER** |
| **WELLS FARGO BANK, NATIONAL ASSOCIATION,** | |
| Defendant. | |

Timothy C. Bennett, Timothy Bennett, PC, 4248 Galewood, Lake Oswego, Oregon, 97035. Attorneys for Plaintiff.

Leah C. Lively and Amanda A. Bolliger, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., The KOIN Center, 222 SW Columbia Street, Suite 1500, Portland, Oregon, 97201. Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Debra A. Schultz ("Schultz") asserts claims against her former employer, Wells Fargo

Bank, National Association ("Wells Fargo"), under the Family and Medical Leave Act of 1993

("FMLA") and Oregon's common law of wrongful discharge. Schultz asserts three separate

FMLA claims: an interference claim under 29 U.S.C. § 2615(a)(1), a retaliation claim under 29

U.S.C. § 2615(a)(2), and a retaliation claim under 29 U.S.C. § 2615(b). Wells Fargo moves for summary judgment against all of Schultz's claims. Dkt. 39. For the reasons discussed below, Wells Fargo's motion is granted in part and denied in part: the motion is granted with respect to Schultz's claim under 29 U.S.C. § 2615(b) and denied with respect to all other claims.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient. . . . " *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotations and citation omitted).

## BACKGROUND

Schultz was employed by Wells Fargo from June 1978 until November 11, 2009. Declaration of Debra Schultz ("Schultz Decl.") ¶ 1. Dkt. 47. Schultz's position at the time of her termination was Store Manager 4. When Schultz was promoted to Store Manager 4 in 2002, Debi Klinetobe, as District Manager, became Schultz's direct supervisor. *Id*. ¶ 12. In approximately 2005, Klinetobe was promoted and became responsible for hiring District

Managers. *Id.* ¶ 14. Klinetobe encouraged Schultz to apply for a District Manager position, but Schultz declined. *Id.* In 2007, Mark Trupp, as District Manager, became Schultz's direct supervisor and Klinetobe remained Schultz's second-level supervisor.

During the first 30 years of her career at Wells Fargo, Schultz consistently received raises, promotions, increases in responsibility, and positive performance reviews. *Id.* ¶ 2. For the years 1995, 1998, 2000, 2001, 2002, 2004, and 2006 Schultz received a performance evaluation rating of "4," meaning "consistently above all targets" or its equivalent from earlier forms, indicating that she exceeded all expectations. Schultz Decl. Ex. 1. Dkt. 47-1. For the years 1996 and 2003 Schultz received a performance evaluation rating of approximately "3.5," indicating that she was between exceeding some and exceeding all expectations. In 1997, Schultz received a performance evaluation rating of "3," indicating that she met expectations. *Id.* at 120. From 1995 through 2006,[1] for her year-end cumulative performance evaluation, in no individual category did Schultz receive a performance rating indicating that she needed improvement or missed a target.

In April 2007 Schultz requested and received approved FMLA medical leave to undergo surgery on her legs. *Id.* ¶ 18. She returned to work full time on July 9, 2007. *Id.* Schultz returned from leave to the same position with the same salary and benefits she had before taking the leave. Schultz Depo. 87:23-88:15.[2]

---

[1] The record does not contain a performance evaluation from 2005; it appears no performance evaluation of Schultz was completed for that year. Additionally, for 2007, the first year that Trupp was Schultz's supervisor, no performance evaluation was completed for Schultz.

[2] Excerpts of Schultz's deposition are attached as Exhibit 18 to the Declaration of Amanda Bolliger (Dkt. 44-1) and Exhibit 1 to the Declaration of Timothy C. Bennett (Dkt. 48-1). Other deposition excerpts are attached as additional exhibits to Ms. Bolliger and Mr. Bennett's declarations. Citations to deposition testimony are to the deposition page number, not the exhibit page number. In contrast, citations to exhibits attached to the declarations submitted by both parties are to the exhibit page number.

On March 1, 2008, Schultz took a second approved FMLA medical leave to have additional surgery on her legs, expecting stents to be placed in her legs. Schultz Decl. ¶ 19. Instead of receiving stents, Schultz awoke to discover that an above-the-knee amputation had been performed on her left leg. *Id*. Schultz was released by her doctor to work for four hours a day on June 16, 2008, and to work full time on June 30, 2008. Bennett Decl. Ex. 33 (Dkt. 48-33); Schultz Depo. 90:4-16. Schultz returned from leave to the same position with the same salary and benefits she had before taking the leave. Schultz Depo. 97:11-98:12.

On September 25, 2008, a Wells Fargo employee emailed Trupp, discussing concerns expressed by Debbie Lightner, a service manager in Schultz's branch, regarding Schultz's health and welfare and ability effectively to perform her duties. Bennett Decl. Ex. 27. Dkt. 48-27. Lightner reported that employees had reported observing Schultz napping, falling asleep at her desk, falling at work once, appearing to be in pain, hearing that she had fallen at home, and seeming to have difficulties with her prosthesis. *Id*. At the time of this email Trupp was on paid time off from work, and he forwarded the email to Teresa Kraljev, a Human Resources Consultant at Wells Fargo. Trupp stated he would inform Klinetobe of the issue and have Klinetobe speak with Schultz. *Id*. Kraljev wanted to speak with Klinetobe before she spoke with Schultz so Kraljev could provide "talking points" to Klinetobe. *Id*.

On September 26, 2008, Kraljev forwarded the email regarding Schultz to Klinetobe, along with talking points and instructions about what to say during the conversation with Schultz. Bennett Decl. Ex. 25. Dkt. 48-25. Kraljev requested that Klinetobe tell Schultz that: (1) she is a hard working manager with a good work ethic and the best of intentions; (2) she is a valuable contributor; (3) management had received information and has concerns regarding Schultz's safety and her interaction with team members and customers, and changes had to be

made; (4) customers were not aware of Schultz's medical situation and did not know why she was falling asleep and that it is not acceptable for Schultz to fall asleep at work; (5) if her tiredness is caused by medication, Schultz needs to check with her doctor; (6) management has concerns about Schultz's pain and does not want her to work while in pain; (7) management has concerns about liability if Schultz hurts herself at work; (8) Schultz is putting her team members in a difficult position by making them wake her up after a nap or after falling asleep while working; (9) it is critical that Schultz file an injury report if she falls and injures herself at work; (10) Schultz should contact employee assistance for any needs; (11) Schultz has the option of (a) consulting with her physician regarding her problems to determine whether Schultz should remain at work, (b) contacting Wells Fargo's employee assistance department for a fitness for duty discussion and that department will then contact Schultz's physician to discuss the situation and decide next steps, or (c) pursuing additional leaves of absence, whether for personal leave or medical leave; and (12) if Schultz chooses not to pursue any of these options, management would address any continuing issues within Wells Fargo's "performance management guidelines." *Id.* Kraljev copied Trupp, among others, on this email. *Id.*

On September 30, 2008, Klinetobe approached Schultz at her desk and questioned Schultz about her health and welfare. Schultz Decl. ¶ 24. Klinetobe asked Schultz about her medications, who was taking care of her, whether her brother and sister-in-law were assisting her, and what was on Schultz's nose; Klinetobe also repeatedly noted that Schultz may wish to work only four hours a day and that Schultz's medication may be affecting her ability to work. *Id.*; Schultz Depo. 34:15-20, 36:19-37:6, 116:4-15. Schultz responded that she had been released to work full time by her doctor, that her doctor would not release her if she wasn't ready, that no one was taking care of her, that she was an adult, and that she could take care of herself. Schultz

Depo. 36:19-37:8; Schultz Decl. ¶ 24. Klinetobe did not disclose the knowledge or involvement of Trupp or Kraljev relating to the issues identified in the conversation or in crafting the talking points for the conversation.

Also on September 30, 2008, Klinetobe emailed Kraljev and Trupp, among others, memorializing the conversation Klinetobe had with Schultz on that day. Bennett Decl. Ex. 26. Dkt. 48-26. Klinetobe noted that Schultz "kept on saying that she can't go part time because her team needs her" and that Klinetobe "kept saying that they need her long term and she first needs to take care of herself." *Id*. Klinetobe noted that she told Schultz that Wells Fargo wants to ensure that all allowances are made to Schultz while she is adjusting to walking on her new prosthesis and that Schultz admitted that while she is adjusting to her new prosthesis she is bound to fall in the future. Klinetobe asked Kraljev what the next steps should be to respond to Schultz's difficulties in adjusting to her prosthetic leg. *Id*. Klinetobe also reported that Schultz would discuss with her doctor whether she needs any special accommodation at work. *Id*.

On or about October 1, 2008, Schultz called Kraljev to complain about Klinetobe's comments and questions. Schultz informed Kraljev that she was not comfortable with Klinetobe's line of questioning and that it was inappropriate, and Schultz also indicated that she felt Klinetobe was discriminating against Schultz. Schultz Depo. 34:14-36:10; Schultz Decl. ¶ 25. Schultz further told Kraljev that she felt Klinetobe was taking negative action against Schultz because Klinetobe was pressuring Schultz to work only four hours a day. Schultz Depo. 36:15-37:8; Schultz Decl. ¶ 25. Kraljev quickly stopped the conversation, noting that she and Don Pearson, Wells Fargo's Regional President, already knew about Klinetobe's questioning. Schultz Depo. 34:15-35:5, 36:7-10; Schultz Decl. ¶ 25. Kraljev apologized to Schultz. Schultz Depo. 36:7-10; Schultz Decl. ¶ 25. Kraljev did not disclose her own involvement in crafting the

talking points or the email Kraljev had received from Klinetobe describing the conversation. Kraljev Depo. 105:4-14.[3] Kraljev followed up orally with Klinetobe, informing her that the line of questioning of Schultz was inappropriate. Kraljev Depo. 108:5-7. Kraljev also orally reported Schultz's complaint against Klinetobe to Kraljev's supervisor, Cathy Cole. Kraljev Depo. 110:12-21.

On October 3, 2008, Schultz met with her doctor and explained her concerns with her prosthesis and her employer's concerns with Schultz's fitness for duty. Schultz Decl. ¶ 26. Because of her conversation with Klinetobe, Schultz felt pressure from her employer to take medical leave or work part time and felt that she needed to obtain another release from her doctor stating that Schultz could still work full time. *Id.*

On February 20, 2009, Trupp presented a Memo of Understanding: Performance Store Manager ("MOU") to Schultz, which states that it is documenting the sales performance agreements and expectations discussed between Trupp and Schultz on February 5, 2009. Bennett Decl. Ex. 14. The MOU also set forth the minimum standards Schultz's branch would need to meet for 2009 and identified fifteen activities for Schultz that "should be taken to ensure performance is improved to and sustained at an acceptable level." *Id.* Schultz refused to sign the MOU. Schultz felt it was unwarranted because she had been on medical leave for more than 25 percent of 2008 and there was construction around her branch that made access to it difficult; Schultz also believed the MOU was retaliatory, unfair, improper, and illegal. Schultz Depo. 157:5-10, 158:10-159:7; Schultz Decl. ¶ 31. This was the first time in her nearly 31 years at Wells Fargo that Schultz was written up for any performance issue. Schultz Decl. ¶ 4. On

---

[3] Kraljev's deposition excerpts are attached as Exhibits 3 and 4 to the Bennett Declaration. Dkts. 48-3, 48-4.

February 23, 2009, Trupp spoke with Kraljev regarding Schultz and the MOU. Bennett Decl.

Ex. 9. Dkt. 48-9.

Schultz suffered from acute renal failure and was hospitalized suddenly in or around

March 13, 2009. Schultz Decl. ¶ 32. Wells Fargo approved a third FMLA leave from March 13

through March 22, 2009. *Id*. Schultz returned from leave to the same position with the same

salary and benefits she had before taking the leave. Schultz Depo. 108:20-109:17. Within one

week, however, Schultz was transferred to a different location, demoted to a different position,

and her bonus potential was reduced.

For all three of Schultz's FMLA leaves of absence, no one at Wells Fargo told Schultz

that she should not take FMLA leave or discouraged her from taking any such leave. Schultz

Depo. 85:15-86:6, 94:10-25, 102:17-103:3.

On March 23, 2009, the day that Schultz returned from her third FMLA leave, Trupp

provided Schultz with her performance evaluation for the year 2008. For the first time in her

career, she received a cumulative year-end rating in one specific performance category that she

did not meet all of her key targets.[4] Schultz Decl. Ex. 1 at 75. Her overall rating for 2008 was a

"3," indicating that she met expectations. *Id*. Of the eleven performance evaluations for Schultz

contained in the summary judgment record, 1997 and 2008 were Schultz's two lowest

performance ratings, at a level of "3." For the remaining years she was rated above a "3," or its

equivalent in earlier forms.

In approximately early March 2009, Trupp was informed that there was going to be

branch realignment and he would no longer be supervising the Hollywood-Rose City branch,

---

[4] The performance evaluations contain several individual categories and then an "overall" evaluation. The low performance rating in 2008 was in the category "Service Management."

where Schultz was working. Trupp Depo. 177:18-25.[5] Immediately after Schultz returned from her third FMLA leave on March 23, 2009, Trupp discussed with Schultz that she should accept a transfer out of the Hollywood-Rose City branch. Trupp Depo. 179:8-20. Trupp indicated that if Schultz did not accept the transfer, she may lose her job. Schultz Decl. ¶ 33. Trupp promised that Schultz's salary would stay the same. *Id.* Schultz agreed to the transfer. *Id.* Trupp then informed Schultz that she would be transferred to the East Lake Grove branch. *Id*. This ensured that Schultz stayed under Trupp's supervision. Trupp Depo. 179:8-180:4.

Trupp testified that he was concerned based on the performance of the Hollywood-Rose City branch that if he did not transfer Schultz to stay under his supervision, Schultz may lose her job. Trupp Depo. 179:21-180:4. According to Wells Fargo's records, the performance of the Hollywood-Rose City branch for the first quarter in 2009, which is the time of Schultz's transfer, was as follows: 74.9 percent in profit, 70.3 percent in checking, 65.4 percent in solutions, and an overall 70.2 percent of plan. Bolliger Decl. Ex. 6 at 21. The final annual numbers for 2009 were 89.3 percent in profit, 91 percent in checking, 84.3 percent in solutions, and an overall 88.5 percent of plan. Trupp Depo. 181:2-6. The branch did not meet its 2009 plan targets. *Id*. The annual numbers were better than the first quarter numbers, indicating that the branch performed better after Schultz was transferred.

After her transfer to the East Lake Grove branch, Schultz went from managing a location with six bankers and around 22 staff to a location with one banker and about 10 staff. *Id*. Schultz was also demoted from "Branch Manager 4" to "Branch Manager 1" and lost bonus pay potential. *Id*. Schultz's transfer and demotion were effective April 1, 2009. Bennett Decl. Ex. 15.

---

[5] Trupp deposition excerpts are attached as Exhibit 38 to the Bennett Declaration. (Dkt. 48-38) and Exhibit 36 to the Bolliger Declaration (Dkt. 44-19).

Dkt. 48-15. Schultz also had to work Saturdays at the Lake Grove branch (different from the East

Lake Grove branch), which did not have a wheelchair-accessible restroom. Schultz Decl. ¶ 36.

Sometime in October 2009, Schultz issued a written warning to Ashley Johnson, a

service manager under Schultz's supervision, for not meeting sales goals. *Id.* ¶ 40. On

October 27, 2009, Johnson emailed Kraljev, reporting that Schultz had sent $200 from her

personal account to a motel for the benefit of "Jane Doe," a Wells Fargo customer. Bolliger

Decl. Ex. 4. Dkt. 43-4. Johnson reported that she had taken a call from Jane Doe, who had called

and asked for Schultz and left a message that Schultz was supposed to send money to the motel

and needed to send it right away. Johnson reported that when she gave the message to Schultz,

Johnson asked whether Schultz was going to send money from her own account, and that Schultz

stated she would not because she could get fired for doing that. *Id.* Johnson also reported that she

later noticed an envelope addressed to the motel and that she could see through the envelope and

saw that it contained a money order from Schultz that was unsigned. *Id.* Johnson further reported

that she returned the envelope to Schultz and told her that she needed to sign it; Schultz then

responded, "You always catch me with everything." *Id.* Johnson reported that Schultz then re-

sent the signed money order to the motel. Kraljev forwarded this email to Debi Wilkinson, an

Investigator at Wells Fargo.

On November 4, 2009, Johnson sent another email to Kraljev, reporting that Jane Doe

had called asking for Schultz and when Johnson told Jane Doe that Schultz was unavailable, Jane

Doe told Johnson that Schultz had loaned money to Jane Doe and Jane Doe asked Johnson how

did Johnson think Schultz would want the money paid back—check or money order. Bolliger

Decl. Ex. 28. Dkt. 44-11. Kraljev forwarded this email to Trupp and Wilkinson.

PAGE 10 – OPINION AND ORDER

Jane Doe was a special needs customer of the Hollywood-Rose City branch for more than eight years. Schultz Decl. ¶ 41. Schultz had frequently interacted with Jane Doe during this period and found her to require special attention and patience. *Id*. Jane Doe sought Schultz out when Jane Doe came to the bank, considered Schultz a friend, was dependent on Schultz, would visit Schultz at the bank for personal visits, and would send Schultz postcards and notes to Schultz's home address. Schultz Decl. ¶ 41; Schultz Depo. 80:23-82:5; Kraljev Depo 198:23-200:6. Schultz knew that Jane Doe had sometimes required urgent deposits from her mother or brother and that sometimes Jane Doe would take a "direct deposit advance" from her account. Schultz Decl. ¶ 42. Schultz also knew that Jane Doe's mother and brother had passed away in 2008 or early 2009 and that money left for Jane Doe was then deposited in a Wells Fargo account that did not permit direct deposit advances. *Id*. ¶ 43. In 2009, after Schultz was transferred to the East Lake Grove branch, she received an urgent phone call from Jane Doe needing emergency access to her funds. *Id*. ¶ 44. Schultz conferred with Trupp, and received permission to authorize a wire transfer to Jane Doe, even though Wells Fargo could not obtain Jane Doe's written authorization, which is a requirement for a wire transfer. *Id*. Approving such a transfer was unusual. *Id*.

In October 2009, Schultz received a call from Jane Doe requesting a direct deposit advance for housing. *Id*. ¶ 45. Schultz informed Jane Doe that her account did not offer direct deposit advances and that there was a 30-day waiting period to change the type of account to one that did permit such advances. *Id*. Jane Doe pleaded with Schultz to loan or give Jane Doe the funds, or else she would become homeless. *Id*. Jane Doe called back later and notified Schultz that she had received half of the funds through a public agency worker, but she still needed $200. *Id*. Schultz then agreed to send the money to the motel at which Jane Doe was staying. Schultz

sent $200 from Schultz's personal account. *Id.* Schultz did not expect to get repaid and did not care if she was ever repaid. *Id.* ¶ 46. Schultz disputes Johnson's report of their interactions and discussions relating to the $200 sent to the motel. *Id.*; Schultz Depo. 126:2-128:14, 135:24-136:2.

Kraljev tasked Wilkinson to be the lead investigator on the alleged loan by Schultz. Wilkinson reviewed Johnson's email, Wells Fargo's Code of Ethics policy regarding loaning money to customers, the $200 money order, Schultz's personal bank account information, and Jane Doe's customer information. Bolliger Exs. 4-6; Wilkinson Depo. 53:7-23, 78:5-14, 153:4-8, 153:14-18, 158:17-23, 160:6-161:17, 163:14-21.[6] Kraljev and Wilkinson both worked on the investigation and jointly interviewed Schultz regarding the allegations. Wilkinson Depo. 95:2-14, 134:17-25; Kraljev Depo. 225:16-227:10. At some point in time Wilkinson also brought Trupp into the investigation. Wilkinson Depo. 95:2-24.

On November 5, 2009, Schultz was interviewed by Wilkinson and Kraljev. Trupp did not participate in the interview of Schultz. Trupp Depo. 238:10-12. Before the interview, however, Kraljev emailed Trupp asking to meet with him before the interview if Trupp was not going to participate to make sure that "we are on the same page." Bennett Decl. Ex. 12.

What was said during Schultz's interview is in dispute. Wilkinson's notes, taken at the time of the interview, indicate that Schultz admitted she "loaned money to a customer." Bennett Decl. Ex. 35 at 5. Dkt. 48-35. Schultz does not recall making such an admission. Schultz Decl. ¶ 46. Schultz disputes that she "loaned" money to Jane Doe. Schultz Depo. 118:13-14. Schultz admits only that she "gave" a customer $200 by mailing it to the motel. Schultz Depo. 118:13-16.

---

[6] Wilkinson deposition excerpts are attached as Exhibit 25 to the Bolliger Declaration. Dkt. 44-8.

After the interview, Kraljev and Wilkinson called Trupp. Trupp Depo. 238:13-239:2;
Kraljev Depo. 281:9-18. They told Trupp that they believed Schultz had violated the Code of
Ethics and that there is a zero tolerance for such violations. *Id.* Schultz was placed on
administrative leave. This decision resulted from a collaboration among Trupp, Kraljev, and
Wilkinson. Trupp Depo. 238:13-241:21.

Who made the decision to terminate Schultz is in dispute. At oral argument, Wells Fargo
represented that Trupp made the decision, and in his declaration Trupp states that he made the
decision. Trupp Decl. ¶ 3. Deposition testimony, however, indicates that Trupp recommended
termination, but that the final decision was made at supervisory levels above Trupp. *See* Kraljev
Depo. 280:1-24, 289:24-290:18; 292:7-24; Cole Depo. 77:19-78:9.[7] Kraljev also represented to
Schultz that the decision would be made by Trupp, Klinetobe, and Cole, with Cole having the
option of bringing Pearson into the decision making process. Kraljev Depo. 178:1-12; 279:2-25.
Kraljev informed Cole about the interview with Schultz and Trupp's recommendation of
termination. Kraljev Depo. 280:12-18, 288:10-289:5, Cole Depo. 16:8-20, 78:1-9. Cole then
discussed the issue of Schultz's termination with Pearson. Cole Depo. 78:6-9; Pearson Depo
29:19-30:14. Schultz was terminated on November 6, 2009, purportedly for violating Wells
Fargo's Code of Ethics and Business Conduct by loaning money to a customer.

Part of Wells Fargo's Team Member Handbook[8] is the Code of Ethics and Business
Conduct ("Code of Ethics"). Bolliger Decl. Ex. 1. Dkt. 43-1. The Code of Ethics "sets forth
Wells Fargo's policy and standards concerning ethical conduct for all team members." *Id*. at 38.

---

[7] Excerpts of the Cole deposition are attached as Exhibit 20 to the Bolliger Declaration.
Dkt. 44-3.

[8] Wells Fargo refers to its employees as "team members."

Wells Fargo employees are trained annually on the Code of Ethics. Schultz was trained on the

Code of Ethics in November 2008 and again in February 2009. Schultz Depo. 66:4-19.

As relevant here, the Code of Ethics provides:

> You must not lend personal funds to, consign, endorse, guarantee,
> or otherwise assume responsibility for the borrowings of any
> customer or vendor of Wells Fargo unless the customer or vendor
> is a family member or other relative.

Bolliger Decl. Ex. 1 at 44.

The Code of Ethics also provides:

> 2. Giving Gifts – Team members who wish to give gifts to
> vendors, customers or officials, or who are asked to authorize such
> gifts, must follow standard expense authorization procedures.
>
> Gifts valued at more than $200 to a current or potential customer
> within any calendar year must be approved, in writing, by your
> Code Administrator.

*Id*. at 48.

## DISCUSSION

### A.  FMLA Interference Claim

#### 1.  Standards

Schultz alleges an FMLA claim under 29 U.S.C. § 2615(a)(1), which provides that "[i]t

shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the

attempt to exercise, any right provided under this subchapter." Claims under this provision are

known as "interference" claims.

When a plaintiff alleges retaliation for exercising his or her rights under the FMLA, in the

Ninth Circuit such a claim is properly analyzed as an interference claim under Section

2615(a)(1). *See Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001) ("By

their plain meaning, the anti-retaliation or anti-discrimination provisions do not cover visiting

negative consequences on an employee simply because he has used FMLA leave. Such action, is instead, covered under § 2615(a)(1), the provision governing 'Interference with the Exercise of rights.'"); *see also Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1133 n.7 (9th Cir. 2003) (noting that some circuits have held that claims in which the plaintiff alleges that he or she was subjected to an adverse employment action for taking FMLA protected leave are properly brought under Section 2615(a)(2), but that in the Ninth Circuit such claims are properly brought under 2615(a)(1), and that 2615(a)(2) applies only to employees who oppose employer practices made unlawful by the FMLA). To sustain an FMLA interference claim, a plaintiff must show by a preponderance of the evidence that: (1) the plaintiff took or requested protected leave; (2) the employer subjected the plaintiff to an adverse employment action; and (3) the taking of or requesting protected leave was a "negative factor" in the adverse employment decision. *See Bachelder*, 259 F.3d at 1125; *McCauley v. ASML US, Inc.*, 917 F. Supp. 2d 1143, 1152 (D. Or. 2013); 29 C.F.R. § 825.220(c). A plaintiff may prove an interference claim "by using either direct or circumstantial evidence, or both." *Bachelder*, 259 F.3d at 1125.

It is undisputed that Schultz took protected leave and that her termination was an adverse employment action. Wells Fargo argues, however, that there is no evidence that Schultz's protected leave was a negative factor in the decision to terminate her.

Schultz argues that her transfer and concomitant demotion, before her termination, was an additional adverse employment action. Wells Fargo responds that the transfer occurred more than two years before Schultz filed this action and, thus, FMLA claims relating to Schultz's transfer and demotion are time-barred under the applicable statute of limitations. Wells Fargo also responds that, as with Schultz's termination, there is no evidence that Schultz's protected

leave was a negative factor in the decision to transfer and demote Schultz. The Court addresses each of these arguments in turn.

### 2. Statute of Limitations

Schultz filed this action on November 4, 2011. The general limitations period for an FMLA claim is two years "after the date of the last event constituting the alleged violation." 29 U.S.C. § 2617(c)(1). Where a violation is willful, however, the limitation period is extended to three years. 29 U.S.C. § 2617(c)(2).

"While neither the Supreme Court nor the Ninth Circuit Court of Appeals has defined willfulness under the FMLA, other circuits have looked to the Supreme Court's definition of 'willful' in the context of the Fair Labor Standards Act ('FLSA')." *Shulman v. Amazon.com, Inc.*, No. C13–247RSM, 2013 WL 2403256, at *2 (W.D. Wash., May 30, 2013) (citing *Golez v. Potter*, No. 09cv0965 AJB (WMC), 2012 WL 368218, at * 4 (S.D. Cal. Apr. 11, 2012) (collecting cases)). Under the FLSA, an employer acts "willfully" when he or she "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). Thus, to establish a willful violation of the FMLA, "a plaintiff must show that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Batson v. T-Mobile U.S.A.*, Civ. No. 08-6204-AA, 2010 WL 1924676, at *2 (D. Or. May 11, 2010) (citation and quotation marks).

Here, Schultz alleges that she was demoted, transferred, and ultimately terminated because she took protected leave. The evidence in the record shows that all of the persons involved in the decisions to demote, transfer, and terminate Schultz knew that she had taken protected leave. The record also shows that all of these managers had discussions contemplating that Schultz may need to take additional personal or medical leave. Schultz's demotion and

PAGE 16 – OPINION AND ORDER

transfer occurred within days of her return from her third protected leave in 2009 and her termination occurred just over seven months from her return from that protected leave. Further, a few months after returning from protected leave in 2008 Schultz was subjected to an invasive and inappropriate line of questioning regarding her medical condition and her possible need for future additional leaves or to work part time, and critical comments regarding her performance. A few months after that she received a written MOU critical of her performance based on her branch's overall performance, the first that she received during her long career at Wells Fargo. Further, the day Schultz returned from her third FMLA leave in 2009 she received the most negative annual performance evaluation in the summary judgment record, and she was approached about transferring branches within a day or two after returning from leave in 2009.

Viewing this evidence in the light most favorable to Schultz, as the court must do at this procedural stage of the lawsuit, the evidence precludes a finding as a matter of law that Wells Fargo's violation was not willful. A rational jury could find that Wells Fargo knew or acted with reckless disregard as to whether its conduct violated the FMLA. *See, e.g., Valentine v. Cal. Emp't Dev. Dep't.*, No. CV 10-8717 CAS (SSx), 2012 WL 386682, at *7 (C.D. Cal. Feb. 6, 2012).

The Court finds that, for purposes of the pending motions, the three-year limitations period applies to Schultz's claims; therefore alleged conduct on or after November 4, 2008 is within the limitations period. Thus, Schultz's transfer and demotion are within the limitations period.

### 3. Causation

An employer's knowledge that the plaintiff engaged in protected activity or the proximity in time between the protected activity and the allegedly retaliatory employment decision can support an inference of causation. *See Howard v. Milwaukie Convalescent Hosp., Inc.*, Civ. 08-

42-KI, 2008 WL 4117167, at *4 (D. Or. Aug. 25, 2008) (citing *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1069 (9th Cir. 2003); *Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000). Wells Fargo argues that Schultz cannot show that protected leave was a negative factor in her transfer and demotion because Trupp transferred Schultz due to poor performance and to "save" her job. Wells Fargo argues that Schultz cannot show that protected leave was a negative factor in her termination because there is too great of a time delay to infer causation and because there is no evidence that any person involved in the decisions considered Schultz's leave as a negative factor. Viewing the evidence in the light most favorable to Schultz, Wells Fargo's arguments are unavailing.

> ### a. Transfer and demotion

Schultz returned from her third protected FMLA leave on March 23, 2009. On that day, Trupp provided Schultz with the most negative of the 11 annual performance reviews contained in the record, and significantly more negative than any performance review given to Schultz since 1997. Within a few days of Schultz's return from leave, Trupp also told Schultz she needed to accept a transfer to save her job. Trupp transferred Schultz to ensure she stayed under his supervision. Trupp knew about all of the FMLA leaves of absence that Schultz had taken and was involved in the detailed email discussions regarding the fact that Schultz might need additional leave while adjusting to her new prosthetic leg. The proximity of only a day or two between Schultz's return from her third leave and her transfer and demotion is sufficient to allow a factfinder to infer the requisite causation. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) ("[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity."); *see also Bell v. Clackamas Cnty.*, 341 F.3d 858, 866 (9th Cir. 2003) (finding temporal proximity of four days to be strong circumstantial evidence to infer causation).

Even if temporal proximity alone were insufficient, however, viewing the evidence in the light most favorable to Schultz, she has raised a genuine dispute of material fact as to whether her protected leave was a negative factor in her transfer and demotion. In early March 2009, Trupp was facing a realignment and would no longer be supervising the Hollywood-Rose City branch. Wells Fargo argues that Trupp's motive in transferring Schultz was to help Schultz keep her job because Trupp was concerned his replacement may terminate Schultz based on the poor performance at the Hollywood-Rose City branch.

Schultz returned from leave in July 2008 and Schultz's managers discussed at the end of September 2008 that Schultz may need to take additional leave or work part time due to her difficulties adjusting to her amputation. Within a few weeks of that discussion, Trupp met with Schultz to criticize her performance. Trupp Depo. 160:20-161:23. He had a similar conversation with Schultz in November 2008. *Id.* 166:10-13. Then in late February 2009, Trupp issued the MOU criticizing the performance of Schultz's branch.

For the year 2008, the Hollywood-Rose City branch performed at 95.2 percent of plan in profit, 116.2 percent in checking, 93.3 percent in solutions, and an overall 101.6 percent of plan. Bolliger Decl. Ex. 33 at 17. This was better than nine of the 23 branches identified by Wells Fargo as part of the "Southeast Corridor." *Id*. Thus, the Hollywood-Rose City branch performed better than 40 percent of Wells Fargo branches within its geographic area.

For the month of February 2009, the full month preceding Trupp's decision to transfer Schultz, the Hollywood-Rose City branch performed at 70.6 percent of its plan targets. Bolliger Decl. Ex. 33 at 19. There were two other branches that performed significantly worse, at 60.7 percent and 49.7 percent of their respective plan targets, one branch that performed at 68 percent of plan, and another branch that performed at 71.9 percent of plan. *Id*. Trupp did not issue

performance-related MOUs to any other branch manager under his supervision. The record is unclear as to whether the four branches that performed similar to or significantly worse than Schultz's branch were under Trupp's supervision, but regardless there is nothing in the record showing that the branch managers of those four branches were transferred or received an MOU similar to the one Trupp issued to Schultz for performance concerns.[9] Further, immediately upon Schultz's return from leave in 2009, Trupp issued her a mediocre performance review, demoted her, and transferred her.

Viewing the evidence in the light most favorable to Schultz, a rational jury could find that Schultz took repeated leave under the FMLA, that her managers were concerned she may need to take additional FMLA leave, and that this protected conduct was a negative factor in the decision to transfer and demote her. Giving the plaintiff the benefit of the doubt, the evidence creates an issue of fact regarding whether Wells Fargo's treatment of Schultz changed after she took protected leave in 2008 and her managers discussed that she may need to take additional full time or part time leave and whether Wells Fargo engaged in conduct that would chill the exercise of Schultz's rights by criticizing her performance after she returned from leave in 2008, issuing the MOU, and issuing a more negative performance evaluation and demoting and transferring her immediately after her return from leave in 2009. *See, e.g., Schuett v. Eli Lilly & Co.*, No. 3:10-cv-784-HZ, 2011 WL 5865950, at *11-12 (D. Or. Nov. 22, 2011) (denying summary judgment on FMLA interference claim where the plaintiff alleged she was fired because she was pregnant and would require FMLA leave and defendant responded that the plaintiff was fired

---

[9] Schultz submitted what she represents to be the only other MOU by Trupp produced by Wells Fargo. Schultz argues that Trupp's actions against her were unique. Because Wells Fargo failed to place in the record any MOUs issued to or evidence of a transfer of any of the four branch managers of the branches performing poorly, and given that all inferences are drawn in Schultz's favor, it is a reasonable inference that none of the branch managers of the other poorly performing branches received MOUs or were transferred.

because she admitted to falsifying sales calls, because a reasonable juror could conclude that after the plaintiff announced her need for future FMLA leave she received more negative treatment from her manager and that her need for FMLA leave was a negative factor in her termination).

### b.  Termination

#### i.  Knowledge

Wells Fargo argues that there is no evidence that Schultz's taking leave was a negative factor in her termination because Wilkinson and Johnson did not know about Schultz's leave, and Johnson was the employee who reported the alleged violation of the Code of Ethics and Wilkinson investigated it and determined that Schultz had, in fact, violated the Code of Ethics. This argument is unavailing because Wilkinson and Johnson were not the persons who made the decision to terminate Schultz. Trupp testified that placing Schultz on administrative leave was a collaborative decision between Trupp, Kraljev, and Wilkinson. Trupp and Kraljev knew about Schultz's FMLA leave. Who made the final decision to terminate Schultz is a disputed issue of fact, but the evidence shows that the key decisionmakers in Schultz's termination were Trupp, Kraljev, and Cole (and, perhaps, Pearson), all of whom knew about Schultz's prior FMLA leaves.

#### ii.  Temporal proximity

Wells Fargo also argues that the temporal proximity between Schultz's third leave (late March 2009) and her termination (early November 2009) is too distant to support an inference of causation. Whether an adverse employment action is intended to be retaliatory is a "question of fact that must be decided in the light of surrounding circumstances." *Coszalter v. City of Salem*, 320 F. 3d 968, 978 (9th Cir. 2003). Time periods of up to a year have been held to support a finding of causation at summary judgment. *See id.* ("Depending on the circumstances, three to

eight months is easily within a time range that can support an inference of retaliation."); *Allen v. Iranon*, 283 F.3d 1070, 1078 (9th Cir. 2002) (11 months); *Dalton v. Wash. State Dep't. of Corr.*, 344 Fed. App'x 300, 303 (9th Cir. 2009) (one year). Courts are cautioned, however, not to "engage in a mechanical inquiry into the amount of time" between protected conduct and an adverse action. *Anthoine v. N. Cent. Cntys. Consortium*, 605 F.3d 740, 751 (9th Cir. 2010). "A rule that any period over a certain time is per se too long (or, conversely, a rule that any period under a certain time is per se short enough) would be unrealistically simplistic." *Coszalter*, 320 F.3d at 977-78. *Coszalter*, however, "did not repudiate *Allen*'s holding that proximity in time may constitute circumstantial evidence of retaliatory motive." *Anthoine*, 605 F.3d at 751.

"For a variety of reasons, some retaliators prefer to take their time: They may wait until the victim is especially vulnerable or until an especially hurtful action becomes possible. Or they may wait until they think the lapse of time disguises their true motivation." *Coszalter*, 320 F.3d at 978. Courts should be "particularly sensitive" to this last point, for if a specified time period is deemed per se too long to support an inference of retaliation, "well-advised retaliators will simply wait until that period has passed." *Id*. Retaliators may also wait until a circumstance arises that they think will disguise their true motivation and provide a legitimate non-retaliatory reason for an adverse employment action.

Here, Schultz's termination occurred slightly over seven months after her latest medical leave. This is within the range that has been found to support an inference of causation. *See Coszalter*, 320 F.3d at 978. Additionally, the surrounding circumstances support such an inference. Based on the evidence in the record, viewed in the light most favorable to Schultz, a rational jury could find that Wells Fargo's treatment of Schultz changed after she returned from her second FMLA leave—particularly after her managers discussed the fact that Schultz might

need to take additional leave or work part time due to her difficulties in adjusting to her amputated leg—in that she began receiving negative oral and written feedback. This treatment caused Schultz to tell Klinetobe that she was afraid for her job.

The treatment of Schultz deteriorated even further upon Schultz's return from her third FMLA leave, at which time she immediately received a more negative annual performance evaluation, a demotion, and a transfer to smaller branch with allegedly inadequate banker support. She was also required to work Saturdays at a location that did not have a wheelchair-accessible bathroom. This treatment caused Schultz to fear that she was being forced to quit or set up to get fired. All of these circumstances show that there is a genuine dispute of material fact as to whether Schultz's taking of FMLA leave was a negative factor in her termination.

## B. FMLA Retaliation Claims

### 1. Standards

Schultz alleges FMLA claims under 29 U.S.C. §§ 2615(a)(2) and 2615(b). Section 2615(a)(2) provides, "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." Section 2615(b) provides that it is unlawful for an employer to discharge or in any other manner discriminate against any individual who:

> (1) has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this subchapter;

> (2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under this subchapter; or

> (3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this subchapter.

29 U.S.C. § 2615(b). Claims under Section 2615(a)(2) and Section 2615(b) are known as "discrimination" or "retaliation" claims. *See Bachelder*, 259 F.3d at 1124; *Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011).

Here, Schultz alleges that she was retaliated against for complaining about (1) Klinetobe's questioning of Schultz after she returned from leave, (2) the MOU, and (3) her transfer to the East Lake Grove branch. Such allegations are properly brought under Section 2615(a)(2) because they allege retaliation for Schultz's complaints about Wells Fargo's allegedly unlawful practices in response to Schultz's taking protected leave and complaining to human resources, not retaliation in response to Schultz's institution of or participation in an FMLA proceeding or inquiry. *See, e.g., deBarros v. Wal-Mart Stores, Inc.*, No. 6:11–cv–06116–AA, 2013 WL 3199670, at *4 (D. Or. June 19, 2013) ("The plain language of § 2615(a)(2) indicates that the statute prohibits discrimination for an employee opposing an employer's violation of the FMLA. Whereas § 2615(b) prohibits discrimination against an employee for his or her participation in an enforcement proceeding."); *Schuett*, 2011 WL 5865950, at *12 (finding that allegations that the plaintiff was terminated for complaining to human resources about her supervisor's attitude toward her after she indicated she would need FMLA leave should be considered under Section 2615(a)(2) and not 2615(b)). Thus, summary judgment is granted against Schultz's claim under 29 U.S.C. § 2615(b).

For Schultz's FMLA retaliation claim under Section 2615(a)(2), although undecided in the Ninth Circuit, other circuits and courts in this district have adopted the *McDonnell Douglas*[10] burden shifting framework when analyzing FMLA retaliation claims. *See Sanders*, 657 F.3d at 777 (acknowledging it is an open question in the Ninth Circuit but that other circuits apply the

---

[10] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973).

*McDonnell Douglas* framework); *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)

(applying *McDonnell Douglas* framework); *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117,

1135 (10th Cir. 2003) (same); *deBarros*, 2013 WL 3199670, at *4 (same).

Under the *McDonnell Douglas* framework, a plaintiff must demonstrate a prima facie

case of retaliation. After a plaintiff has done so, and in the absence of direct evidence of

discrimination, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason

for the adverse employment action. *See Westendorf v. W. Coast Contractors of Nev., Inc.*, 712

F.3d 417, 425 (9th Cir. 2013) (Rawlinson, J., concurring in part and dissenting in part). If the

defendant does so, the burden returns to the plaintiff to produce evidence that the articulated

reason is a pretext for retaliation. *Id*.

Wells Fargo argues that Schultz cannot establish a prima facie case of FMLA retaliation

because Schultz did not oppose any practice protected by the FMLA and cannot show the

requisite causal connection. Wells Fargo further argues that even if Schultz could establish a

prima facie case, Wells Fargo had legitimate, non-retaliatory reasons to transfer and terminate

Schultz and Schultz cannot demonstrate that those reasons were pretextual.

Schultz responds that her complaint to Kraljev regarding Klinetobe's questioning was a

complaint about rights protected under the FMLA because she was complaining about

Klinetobe's attempts to convince Schultz not to return to work full time, and that the evidence

supports both the requisite causal connection to establish a prima facie case and to show that

Wells Fargo's purported reasons for Schultz's transfer and termination were pretextual.

A plaintiff "need produce very little evidence in order to overcome an employer's motion

for summary judgment" because "the ultimate question is one that can only be resolved through

a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full

record." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (quoting *Chuang v. Univ. of Cal. Davis Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000) (quotation marks omitted)); *see also McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004) ("In evaluating motions for summary judgment in the context of employment discrimination, we have emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses."). Viewing the evidence in the light most favorable to Schultz, the Court finds that Schultz has produced sufficient evidence to withstand Wells Fargo's motion for summary judgment.

### 2. Schultz presents a prima facie case

To make a prima facie showing of FMLA retaliation, Schultz must show (1) involvement in a protected activity under the FMLA; (2) an adverse employment action; and (3) a causal link between the protected activity and the employment action. *Washington v. Fort James Operating Co.*, 110 F. Supp. 2d 1325, 1330 (D. Or. 2000) (citing *Morgan v. Hill*, 108 F.3d 1319, 1325 (10th Cir. 1997); *see also Edgar*, 443 F.3d at 508; *Porter v. Cal. Dep't. of Corr.*, 419 F.3d 885, 894 (9th Cir. 2004) (retaliation in the context of Title VII); *deBarros*, 2013 WL 3199670, at *6. For a claim of retaliation under 29 U.S.C. § 2615(a)(2), the protected activity is "opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). Further, the employee must "reasonably believe" that the employer's practice violates the FMLA. 29 C.F.R. § 825.220(e).

The degree of proof necessary to establish a prima facie case on summary judgment is "minimal" and need not "rise to the level of a preponderance of the evidence." *Villiarimo*, 281 F.3d at 1062 (citation and quotation marks). It need only "give[] rise to an inference" of retaliation. *Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 270 (9th Cir. 1996); *deBarros*, 2013 WL 3199670, at *6.

### a. Protected activity

Schultz alleges that her complaint to Kraljev regarding Klinetobe's inappropriate and invasive questioning constitutes protected activity under the FMLA. Wells Fargo argues that it is not protected under the FMLA because Schultz was not complaining that Klinetobe violated the FMLA. Under the FMLA, an employee has the right to return to the same or an equivalent position as before taking the leave, including benefits, pay, and other terms of employment. 29 U.S.C. § 2615(a)(1); 29 C.F.R. § 825.214. Schultz had been returned to her same position in June 2008 working only four hours a day, and two weeks later she was released by her doctor to work full time. She then worked full time for nearly three months before she was questioned by Klinetobe.

The evidence, viewed in the light most favorable to Schultz and considering the minimal evidentiary burden required to make a prima facie case on summary judgment, supports an inference that Klinetobe's conversation with Schultz on September 30, 2008, with input from Kraljev and the knowledge of Trupp, questioned Schultz's ability to return to work full time, and that Schultz specifically stated in her complaint to Kraljev that she felt this line of questioning was inappropriate. Schultz also told Kraljev that she thought Klinetobe was attempting to take some negative action against Schultz by pressuring her to work no more than four hours a day or to take additional leave. Schultz so strongly believed this, that on October 3, 2008, she obtained from her doctor another release to work full time. Further, Kraljev admitted that she found Klinetobe's questioning to be inappropriate and that she both spoke to Klinetobe about it and reported it to Kraljev's supervisor, Cole. This suffices to meet Schultz's minimal burden to show that she complained of conduct that she reasonably believed violated the FMLA.

Schultz further argues that her complaints to Trupp about her transfer to the East Lake Grove branch constituted protected conduct. There is no evidence, however, that she complained

to Trupp that her transfer was a violation of the FMLA or was related in any way to her leave. Schultz testified that she requested a transfer to a larger branch every few weeks and that she complained to Trupp about the lack of a full time banker in the East Lake Grove branch. Schultz Decl. ¶¶ 37, 38. Her testimony here does not show that she complained to Trupp that her transfer was a violation of the FMLA.

Schultz also argues that her refusal to sign the MOU and her query as to whether she should have a lawyer at the interview regarding the alleged loan she gave to Jane Doe constitute protected conduct under the FMLA. These arguments are similarly unavailing because there is no evidence that she complained to anyone at Wells Fargo that she believed either action was a violation of the FMLA.

### b. Causal connection

#### i. Temporal proximity

Schultz's alleged protected activity occurred on October 1, 2008; her demotion and transfer occurred less than six months later and her termination occurred 13 months later. Wells Fargo argues that the time delays are too great to permit an inference of retaliation. As noted above, delays of up to a year have been considered sufficient to support an inference of causation. *See Allen*, 283 F.3d at 1078 (11 months); *Dalton*, 344 Fed. App'x at 303 (one year). Additionally, there is no bright line with regard to temporal proximity; it must be considered in light of the surrounding circumstances. *Coszalter*, 320 F. 3d at 978. The surrounding circumstances in this case "give[] rise to an inference of" retaliation. *Bradley*, 104 F.3d at 270.

Reviewing the evidence and drawing all reasonable inferences in Schultz's favor, a reasonable jury could find that the evidence shows the following: (1) at the time Schultz complained to Kraljev about Klinetobe's questioning, Kraljev cut short the conversation and failed to disclose the fact that she had drafted the talking points for Klinetobe; (2) shortly after

PAGE 28 – OPINION AND ORDER

Schultz complained about Klinetobe's questioning, Trupp began subjecting Schultz to criticisms of her performance; (3) Trupp continued to do so, culminating with a written MOU on February 20, 2009; (4) Trupp then gave Schultz her worst performance evaluation in the record, transferred her, and demoted her; (5) Trupp required Schultz to work in a store one day a week that did not have a wheelchair-accessible restroom; (6) Wells Fargo prevented Schultz from succeeding by transferring her away from the branch she had been managing for over a decade and in which she had established relationships, transferring her to a branch without a banker, which was a gap in her experience and training, sending her to a branch with a youth-oriented culture, and having a manager who was half her age supervise her training on banker's duties and determine when she would have a banker in her branch; (7) Schultz repeatedly requested a transfer out of the East Lake Grove branch so she would have a better chance at succeeding in her job and Wells Fargo refused; (8) several months after Schultz's demotion and transfer, she disciplined a subordinate, who shortly thereafter reported Schultz for a violation of the Code of Ethics for allegedly loaning money to a customer; (9) the circumstances of the alleged "loan" raised a question as to whether the money sent by Schultz to the motel was a loan or a gift; (10) if the money was a gift it might not violate the Code of Ethics at all or, if did, it might properly be viewed only as a minor violation due to inadequate documentation; (11) Wells Fargo did not properly investigate the allegation so that it could "find" a violation of the Code of Ethics and thereby terminate Schultz; (12) Kraljev and Trupp coordinated to "be on the same page" and orchestrate Schultz's interview to ensure Schultz was terminated; and (13) the persons involved in making the decision to terminate Schultz knew about her protected conduct. Thus, the

PAGE 29 – OPINION AND ORDER

temporal proximity along with the surrounding circumstances support an inference of causation.[11]

### ii.  Knowledge of the protected conduct

Knowledge of the protected activity by the decisionmaker is required in order to make a prima facie claim of retaliation. *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003) ("In order to prevail, [plaintiff] must present evidence from which a reasonable trier of fact could conclude that the [decisionmakers] who refused to hire her were aware that she had engaged in protected activity."). Wells Fargo argues that Trupp made the relevant employment decisions and that he did not know about Schultz's complaint regarding Klinetobe. Trupp testified that he did not know about Schultz's complaint to Kraljev. Trupp Decl. ¶ 4. Thus, Wells Fargo argues, Schultz cannot meet her burden to show a prima facie case of retaliation.

Although Trupp testified that he did not know about Schultz's complaint, there is evidence giving rise to an inference that Trupp did know about Schultz's complaint. Evaluating the credibility of Trupp's testimony is an issue for the jury, not for the court at summary judgment. *See Aloe Vera of America, Inc. v. United States*, 699 F.3d 1153, 1165 (9th Cir. 2012) ("In deciding whether to grant summary judgment, 'the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (internal citation omitted)).

---

[11] As discussed above, the circumstances also support an inference that Wells Fargo terminated Schultz for her taking of FMLA leave. Whether Wells Fargo was motivated by Schultz's taking of FMLA leave, complaining about protected conduct, neither, or both, is an issue of fact for the jury to decide.

Trupp was included in all of the September 2008 emails regarding the discussion about Schultz, what should be said by Klinetobe in questioning Schultz, and Klinetobe's follow up after the discussion with Shultz. Further, Kraljev's notes memorializing the conversation she had on October 1, 2008, wherein Schultz complained regarding the inappropriate questioning by Klinetobe, include a notation at the margin of "Mark" (for Mark Trupp). Bennett Decl. Ex. 6. Similar notations in the margins of Kraljev's notes reflect conversations and other follow up that Kraljev has taken with regard to the incident memorialized in the main text. *Id*. Therefore, it is a reasonable inference that Kraljev told Trupp about her October 1, 2008 conversation with Schultz.

Moreover, Schultz notes that Trupp and Klinetobe worked very closely together, and it is reasonable to infer that Klinetobe would have informed Trupp of Schultz's complaint. The evidence also shows that Kraljev and Trupp communicated closely regarding Schultz in the 2008 and 2009 time frame—Trupp spoke to Kraljev regarding Schultz while he was on paid time off in September 2008 and was copied on the September 2008 emails. Trupp also called Kraljev and told her about Schultz's MOU.

In the context of Wells Fargo's motion for summary judgment, Schultz has the better argument that the evidence shows a genuine dispute of material fact as to whether Trupp knew about the protected conduct. *See, e.g., McCauley*, 917 F. Supp. 2d at 1153-54 (finding a genuine dispute regarding the decisionmaker's knowledge despite uncontradicted testimony that he lacked knowledge because of his interactions with managers who did have the knowledge); *Day v. United Parcel Serv., Inc.*, 829 F. Supp. 2d 969, 974 (D. Or. 2011) (finding a genuine dispute of fact regarding the decisionmaker's knowledge despite uncontradicted testimony that she did not have knowledge because of her close working relationship with a manager who did have

knowledge and the decisionmaker's inclusion on emails relating to the plaintiff, even though those emails did not discuss the plaintiff's protected conduct). Because Schultz offers sufficient evidence to create a genuine dispute of material fact as to Trupp's knowledge, and the temporal proximity and surrounding circumstances give rise to an inference of retaliation, Schultz has met her "minimal" burden to show causation and has met her "minimal" burden to prove a prima facie case. *Villiarimo*, 281 F.3d at 1062.

### 3. Wells Fargo's assertion of a legitimate non-retaliatory reason for its conduct

After a plaintiff proves a prima facie case of retaliation, the employer must present evidence of a legitimate, non-retaliatory reason for the adverse action. *Westendorf*, 712 F.3d at 425 (Rawlinson, J., concurring in part and dissenting in part). The defendant need not prove the absence of retaliatory intent or motive; it simply must produce evidence sufficient to "dispel the inference of retaliation raised by the plaintiff." *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982).

#### a. Transfer and demotion

Wells Fargo argues that its legitimate, non-retaliatory reason for Schultz's transfer and demotion was so that Trupp could protect Schultz's job due to the poor performance of the Hollywood-Rose City branch under Schultz's management. Wells Fargo does not proffer an explanation for why Schultz had to be demoted to Branch Manager 1 yet was able to keep her Branch Manager 4 salary.

Viewing the facts in the light most favorable to Schultz, the court is unconvinced that Trupp's proffered reason for transferring Schultz dispels Schultz's inference of retaliation. The evidence in the record shows that for the year 2008 Schultz's branch performed better than 40 percent of branches in the same geographic region, and that in February 2009 (the last full month preceding Trupp's decision to transfer Schultz) the branch was performing better than four other

branches, with no evidence that those branch managers were disciplined or transferred. Thus, Wells Fargo fails to offer a legitimate, non-retaliatory reason.

Even if it were a sufficient legitimate, non-retaliatory reason, the evidence raises a genuine dispute of material fact that the reason is pretextual. Accordingly, Wells Fargo's motion for summary judgment on Schultz's claim of FMLA retaliation for her transfer and demotion is denied.

### b. Termination

Wells Fargo offers a legitimate, non-retaliatory reason for terminating Schultz. Wells Fargo conducted an investigation and determined that Schultz had violated Wells Fargo's Code of Ethics.

### 4. Pretext

Schultz can prove pretext either "(1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Sanders*, 657 F.3d at 777, n.3 (quoting *Lyons v. England*, 307 F.3d 1092, 1113 (9th Cir. 2002)) (quotation marks omitted). A plaintiff can rely on circumstantial evidence to show pretext, but such evidence must be both specific and substantial. *Villiarimo*, 281 F.3d at 1062.

In assessing whether the employer's proffered reasons for the action are pretextual, "it is not important whether they [are] *objectively* false." *Villiarimo*, 281 F.3d at 1063. "Rather, courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless." *Id.* (citation and quotation marks omitted).

A plaintiff does not have to introduce additional, independent evidence at the pretext stage. *Chuang*, 225 F.3d at 1127. Rather, a plaintiff can "survive summary judgment without producing any evidence of discrimination beyond that constituting his [or her] prima facie case,

if that evidence raises a genuine dispute of material fact regarding the truth of the employer's proffered reasons." *Id.*

As noted above, to the extent Wells Fargo's adequately proffers a legitimate, non-retaliatory reason for Schultz's transfer and demotion, the evidence in the record is sufficient to raise a genuine dispute as to whether the proffered reason is pretextual because it is internally inconsistent and otherwise not believable.

With respect to Schultz's termination, the issue of pretext is a closer call. In considering the temporal proximity and the surrounding circumstances within the rubric of the summary judgment standard, the Court concludes that Schultz has produced sufficient evidence to raise a genuine dispute as to whether Wells Fargo's proffered reason for Schultz's termination is pretextual. As set out in more detail in Section B(2)(b)(i), *supra*, the evidence viewed in the light most favorable to Schultz may be found to show that Wells Fargo changed its treatment of Schultz within weeks after her complaint to Kraljev, continued to treat her differently than it had in the 30 years prior from that point in time all the way through the date of Schultz's termination, prevented Schultz from thriving by transferring her to the East Lake Grove branch with its attendant culture and circumstances, and did not fairly consider the circumstances of the alleged "loan" to Jane Doe and whether the act was, in fact, a violation of the Code of Ethics. Further, the evidence may be found to show that Trupp transferred Schultz to keep her under his supervision so that he could ensure her termination, as opposed to protect her. This creates a genuine dispute as to whether Wells Fargo's reason for discharging Schultz was pretextual. *See deBarros*, 2013 WL 3199670, at *13; *Arjangrad v. JP Morgan Chase Bank, N.A.*, No. 3:10-cv-01157-PK, 2012 WL 1189750, at *19 (D. Or. Apr. 9, 2012); *Schuett,* 2011 WL 5865950, at *17-

19; *Day v. United Parcel Serv., Inc.*, No. CV-09-1261-SU, 2011 WL 5239734, at *10 (D. Or. July 8, 2011).

While the Court acknowledges that the evidence of pretext with respect to Schultz's termination is less persuasive than with respect to her transfer and demotion, the Court finds that Schultz has provided sufficient evidence to raise a genuine dispute of fact as to Wells Fargo's motivation in terminating Schultz. *Davis*, 520 F.3d at 1089 (holding that "very little" evidence is required to defeat employer's summary judgment motion); *McGinest*, 360 F.3d at 1112 (noting that courts should "zealously guard[] an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses").

### C. Schultz's Application for and Receipt of Social Security Benefits

Wells Fargo also argues that summary judgment should be granted against all of Schultz's claims because Schultz applied for and received social security disability benefits, proving that she is not able to work full time and thus her claim that she could have performed her job if Wells Fargo had not wrongfully terminated her is not sustainable. This argument is not persuasive.

The United States Supreme Court has held that applying for and receiving social security disability benefits does not foreclose a suit under the Americans With Disabilities Act ("ADA"). *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 802-03 (1999). The Supreme Court reversed the Court of Appeals, which had held, essentially, that a claim for disability was inherently in conflict with a claim under the ADA because one requires an assertion that the plaintiff is able to work and the other requires an assertion that the plaintiff is too disabled to work. *Id.* at 802. The Supreme Court noted that:

PAGE 35 – OPINION AND ORDER

> In our view, however, despite the appearance of conflict that arises
> from the language of the two statutes, the claims do not
> inherently conflict to the point where courts should apply a special
> negative presumption like the one applied by the Court of Appeals
> here. That is because there are too many situations in which [a
> social security disability claim] and an ADA claim can
> comfortably exist side by side.

*Id*. at 802-03. Before the Supreme Court decided *Cleveland*, the Ninth Circuit Court of Appeals

had reached the same conclusion that representations to the social security administration did not

foreclose recovery under the ADA. *Johnson v. State of Oregon*, 141 F.3d 1361, 13567 (9th

Cir. 1998).

Although this issue in the context of the FMLA is still undecided by the United States

Court of Appeals for the Ninth Circuit, the Sixth Circuit has held that *Cleveland's* rationale also

applies to the FMLA. *Verhoff v. Time Warner Cable, Inc.*, 299 Fed. App'x 488, 498 (6th

Cir. 2008) (holding that plaintiff's receipt of social security disability benefits did not prevent his

recovery under the FMLA). Other courts have reached the same conclusion. *See, e.g., Cherry v.

Yates*, No. CV-07-1806-PHX-DGC, 2009 WL 385478, at *2 (D. Ariz. Feb. 13, 2009); *Spencer v.

Marygrove Coll.*, CIV. A. 07-CV-11135, 2008 WL 4056319, at *13-14 (E.D. Mich. Aug. 26,

2008). The Court finds the reasoning of these cases persuasive, and believes, in light of *Johnson*,

that the Ninth Circuit would also extend *Cleveland's* rationale to claims under the FMLA.

Accordingly, Schultz's claims are not necessarily foreclosed by her application to and

receipt of social security disability payments. Schultz does, however, need to demonstrate an

issue of fact that she would have been able to perform the essential functions of her job at Wells

Fargo had she not been terminated. *See Cleveland*, 526 U.S. at 806 (finding that a plaintiff

"cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total

disability claim. Rather, she must proffer a sufficient explanation"). The ability to perform the

essential functions of one's job is a part of any FMLA case and does not place any unique burden on Schultz or even require a separate jury instruction. *Verhoff*, 299 Fed. App'x at 498.

At oral argument, Schultz pointed to her deposition testimony that after termination she did not seek out employment because she was a 60-year-old woman with diabetes, acute renal failure, an amputated leg, and who had just been fired from her 31-year job. Schultz Depo. 169:16-25. Schultz argues that although those facts may preclude her from obtaining a new job, they did not preclude her from successfully working in November 2008 at Wells Fargo, all while she had the same medical problems. Schultz further argues that filing for social security disability benefits, which she did in June 2011, was a proper mitigation of her damages. Although this issue may present some hurdles for Schultz at trial, she has provided sufficient evidence to survive summary judgment.

**D.  Wrongful Discharge Claim**

Under Oregon law "[i]n general, an employer may discharge an employee at any time, for any reason, unless doing so violates a contractual, statutory or constitutional requirement." *Yeager v. Providence Health Sys. Or.*, 96 P.3d 862, 865 (Or. App. 2004) (citation and quotation marks omitted); *see also Sheppard v. David Evans and Assoc.*, 694 F.3d 1045, 1050 (9th Cir. 2012) (same). The common law tort of wrongful discharge is an exception to this general rule. *Yeager*, 96 P.3d at 865.

Under Oregon law, wrongful discharge occurs "(1) when the discharge is for exercising a job-related right that reflects an important public policy; or (2) when the discharge is for fulfilling some important public duty." *Babick v. Or. Arena Corp.*, 40 P.3d 1059, 1062 (Or. 2002) (citations omitted). The FMLA furthers important public policy and violations of that law may give rise to a wrongful discharge claim. *See Yeager*, 96 P.3d at 866; *Daoud v. Avamere Staffing, LLC*, 336 F. Supp. 2d 1129, 1140-41 (D. Or. 2004).

PAGE 37 – OPINION AND ORDER

A plaintiff must also establish "'a causal connection between a protected activity and the discharge.'" *Perez-Denison v. Kaiser Found. Health Plan of the Nw.*, 868 F. Supp. 2d 1065, 1084-85 (D. Or. 2012) (quoting *Estes v. Lewis & Clark Coll.*, 954 P.2d 792, 796 (Or. App. 1998)). "A 'causal connection' requires a showing that 'the employee's protective activity [was] a substantial factor in the motivation to discharge the employee.'" *Sheppard*, 694 F.3d at 1051 (alteration in original) (quoting *Estes*, 954 P.2d at 797).

Schultz alleges that she was wrongfully discharged for taking protected leave or complaining about Wells Fargo's violations of the FMLA. She relies on the same facts and evidence to support her wrongful discharge claim as she relies on for her FMLA claims. For the same reasons that the Court concluded Schultz has established that a genuine dispute of material fact exists as to Schultz's FMLA claims, the Court concludes that a genuine dispute of material fact exists that precludes summary judgment as to Schultz's claim for wrongful discharge.

**E.  Motion to Strike**

Wells Fargo filed a Motion to Strike Schultz's declaration and memorandum opposing Wells Fargo's summary judgment motion. Dkt. 51. Wells Fargo moves to strike 50 separate statements and paragraphs from Schultz's Memorandum in Opposition to Defendants' Motion for Summary Judgment (Dkt. 46) ("Opposition Memorandum"), arguing that they fail properly to cite to the evidence. The Court is disinclined to parse the argumentative statements of counsel in briefs as part of a motion to strike, and the Court does not consider factual statements in briefs as record evidence. The Court instead relies on factual evidence in the record when evaluating Wells Fargo's motion for summary judgment. Further, Schultz filed an amended memorandum adding further citations to record evidence. Accordingly, Wells Fargo's motion to strike Schultz's Opposition Memorandum is denied.

Wells Fargo also moves to strike Schultz's Declaration in Opposition to Defendants' Motion for Summary Judgment (Dkt. 47) in its entirety because it does not contain a statement that it is based on personal knowledge and that Schultz is competent to testify. In the alternative, Wells Fargo moves to strike 23 statements and paragraphs as inadmissible hearsay, lacking in personal knowledge, a "sham" because the statements contradict Schultz's declaration, prejudicial, or irrelevant.

"[T]he requirement of personal knowledge imposes only a 'minimal' burden on a witness; if reasonable persons could differ as to whether the witness had an adequate opportunity to observe, the witness's testimony is admissible.'" *Strong v. Valdez Fine Foods*, --- F.3d ---, 2013 WL 3746097, at * 1 (9th Cir. July 18, 2013) (quoting 1 *McCormick on Evidence* § 10 (Kenneth S. Broun, 7th ed. 2013). At summary judgment, this "threshold is particularly low because all 'justifiable inferences' must be drawn in favor of the nonmoving party." *Id.* (quoting *Anderson*, 477 U.S. at 255).

Here, Schultz testified under penalty of perjury, and the Court considers the content of her assertions to determine whether they meet the particularly low threshold of personal knowledge, not the fact that she did not include boilerplate language at the beginning of her declaration stating that it is based on personal knowledge. Schultz also filed a supplemental declaration, averring that the facts she attested to were based on personal knowledge. Additionally, although the declaration does not specifically state that Schultz is competent to testify, Federal Rule of Civil Procedure 56(c)(4) requires the declaration "show" that the witness is competent. The admissible statements in the deposition circumstantially indicate that Schultz is competent to testify, and Wells Fargo has not provided any evidence that she is not.

Additionally, Schultz's supplemental declaration also states that she is competent to testify. Thus, Wells Fargo's motion to strike Schultz's declaration in its entirety is denied.

The Court also finds Wells Fargo's argument that Schultz's declaration is a "sham" to be without merit. The sham affidavit rule sets forth that a party cannot manufacture an issue of fact by presenting an affidavit that contradicts prior deposition testimony. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009). Courts are cautioned, however, that:

> [I]t must be recognized that the sham affidavit rule is in tension with the principle that a court's role in deciding a summary judgment motion not to make credibility determinations or weigh conflicting evidence. Aggressive invocation of the rule also threatens to ensnare parties who may have simply been confused during their deposition testimony and may encourage gamesmanship by opposing attorneys. We have thus recognized that the sham affidavit rule "should be applied with caution."

*Id*. The sham affidavit rule requires (1) that the court make a factual finding that any alleged contradiction between a proffered affidavit and prior testimony is actually a sham, and (2) that the contradiction is clear and unambiguous. *Id*. at 998-99.

The Court has reviewed the assertions in Schultz's declaration that Wells Fargo contends are contradicted by Schultz's deposition testimony and does not find that the assertions in the declaration are a sham or that there are clear and unambiguous contradictions between the declaration and the deposition testimony. For example, Wells Fargo argues that Schultz's assertion in her declaration paragraph 25 that Schultz told Kraljev that Klinetobe had taken some negative action against Schultz by saying Schultz should work only four hours a day contradicts Schultz's deposition testimony. Wells Fargo quotes a portion of Schultz's deposition that discusses what Schultz could recall from the conversation with Kraljev and that testimony does not mention negative actions or working only four hours a day, one way or the other. Wells Fargo argues that, "Schultz testified at her deposition that she complained to Kraljev about

'inappropriate questions,' not any 'illegal' questions, 'negative action,' or suggestion that [Schultz] work four hours a day." Def. Memo at 6. Wells Fargo concludes, therefore, that the assertions in the declaration are a sham.

The Court finds that Schultz's failure to recall the "negative action" or "four hours" comments in the colloquy cited by Wells Fargo does not "flatly contradict" her deposition testimony because the testimony in her declaration is "*in addition to*" her deposition testimony. *Van Asdale*, 577 F.3d at 999. The sham affidavit rule "'does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony,'" *id.* at 998 (quoting *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266-67 (9th Cir. 1991)), and contemplates that "'the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition [and] minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit.'" *Id.* at 999 (alteration in original) (quoting *Messick v. Horizon Indus.*, 62 F.3d 1227, 1231 (9th Cir. 1995)).

Further, a close examination of Schultz's deposition testimony provides additional evidence that her declaration does not flatly contradict her testimony. A few pages before the testimony cited by Wells Fargo, Schultz testified as follows:

> Q:    Did you tell Miss Kraljev that you thought Miss Klinetobe had taken some negative action against you aside from just asking you personal questions?
>
> A:    Yes. She thought I should work four hours a day . . . . So that's what happened with that conversation with Debi Klinetobe.

Schultz Depo. 36:15-19. At oral argument, Wells Fargo asserted that Schultz was not answering the question posed to her in this testimony and that her answer reported only what Schultz and Klinetobe discussed and not what Schultz told Kraljev Schultz had discussed with Klinetobe.

PAGE 41 – OPINION AND ORDER

Although Wells Fargo's assertion may be a plausible interpretation, the deposition testimony is ambiguous and could just as easily be interpreted to be Schultz responding to the question asked and then elaborating as what portions of Schultz's conversation with Klinetobe Schultz relayed to Kraljev. With the latter interpretation, Schultz's declaration is in conformity with her deposition testimony. Thus, the Court does not find a clear and unambiguous contradiction between Schultz's declaration paragraph 25 and her deposition testimony. The remaining allegations that Wells Fargo moves to strike under the sham affidavit rule are similarly either not a sham or not a clear and unambiguous contradiction. Wells Fargo's motion to strike portions of Schultz's declaration as a "sham" is denied.

The Court has reviewed the remaining objected-to portions of Schultz's declaration, and finds the following statements inadmissible as not based on personal knowledge:

- ¶ 29: In 2008, Wells Fargo received $25 billion in TARP funds

- ¶ 31: Mr. Trupp would have never attempted to create disciplinary paper on me at Wells Fargo without his boss's, Ms. Klinetobe's, knowledge, support, and approval (if not direct). . . . I knew that my managers, Mr. Trupp and Ms. Klinetobe, were trying to get me to quit

- ¶ 34: Mr. Trupp and Ms. Klinetobe knew what the East Lake Grove branch was like when they chose that as my new location while I was in the hospital on FMLA approved Medical leave.

- ¶ 35: Mr. Trupp and Ms. Klinetobe knew the banker substitute role would be required of me at this branch.

- ¶ 36 I knew that Wells Fargo was trying to get me to quit or fire me

- ¶ 37: Mr. Trupp and Ms. Klinetobe knew my personality, my work history and record, and knew this would be demoralizing for me

- ¶ 40: which was the result Mr. Trupp and Ms. Klinetobe had wanted since 2008 and early 2009, only not for the official reason given

- ¶ 46: and I knew Jane Doe wouldn't have wanted me to get fired for sending my $200 to the hotel to keep her from getting kicked out

Wells Fargo objects to certain additional statements as inadmissible hearsay. The Court has reviewed the objected-to statements and finds that they are either not hearsay or are subject to a hearsay exception. Wells Fargo further objects to certain statements as irrelevant. The Court has reviewed those statements and finds that they are relevant for purposes of showing Wells Fargo's motive and Schultz's allegation of pretext.

The Court also notes that many of Wells Fargo's objections are duplicative of the summary judgment standard itself. *See Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) (noting that "objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself"). The Court has reviewed the record evidence and the parties' argument under the appropriate summary judgment standard and did not consider inadmissible evidence in deciding Wells Fargo's motion for summary judgment.

## CONCLUSION

Wells Fargo's Motion for Summary Judgment (Dkt. 39) is GRANTED IN PART and DENIED IN PART. The motion is granted with respect to Schultz's claim for FMLA retaliation under 29 U.S.C. § 2615(b), and that claim is dismissed. The motion is denied with respect to all other claims. Wells Fargo's Motion to Strike (Dkt. 51) is GRANTED IN PART and DENIED IN PART. The motion is granted with respect to the specific statements of Schultz's declaration identified in this Opinion and Order. The motion is otherwise denied.

**IT IS SO ORDERED**.

DATED this ___th day of September 2013.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge